2000 ME 170

**STATE of Maine**

v.

**Tanner GULICK.**

Supreme Judicial Court of Maine.

Argued: Sept. 5, 2000.
Decided: Oct. 6, 2000.

R. Christopher Almy, D.A., C. Daniel Wood, Esq., A.D.A. (orally), Bangor, for the State.

Jeffrey Silverstein, Esq. (orally), Billings & Silverstein, Bangor, for the defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

SAUFLEY, J.

[¶ 1] The State appeals from the judgment of the Superior Court (Penobscot County, *Mead, C.J.*) vacating the judgment of the District Court (Bangor, *Gunther, J.*) which denied Gulick's motion to suppress evidence that he was operating after suspension. Because we conclude that the District Court did not err, we vacate the judgment of the Superior Court and remand for entry of a judgment of conviction.

## I. BACKGROUND

[¶ 2] We are called upon once again to determine whether a brief detention of a motor vehicle operator was "reasonable" for purposes of the Fourth Amendment.

[¶ 3] The facts at issue are undisputed. At 2:53 A.M., on August 17, 1998, Orono Police Officer William Sheehan watched a car drive into the Med Now parking lot and stop. Med Now is an emergency care medical facility that only operates during the day. Sheehan was concerned that the occupants of the car might be looking for emergency medical treatment. He followed the car into the lot, and parked about ten feet behind it. He did not activate his blue lights or his siren and did not block the vehicle's exit from the parking lot.

[¶ 4] Upon approaching the car, Sheehan spoke briefly with the driver and asked if everything was okay. The driver, Tanner Gulick, responded that everything was fine and asked how far it was to Portland. Sheehan informed Gulick that the trip would take approximately two hours. He then asked to see Gulick's driver's license. Sheehan testified that, at the point that he requested Gulick's license, he was no longer concerned that Gulick or his passenger had a medical emergency.

[¶ 5] Gulick did not have his license with him. Suspicious of Gulick's explanation

for the missing license,[1] Sheehan obtained Gulick's name and date of birth and checked on the status of Gulick's license to operate in Maine. Upon learning that Gulick's license was suspended, Sheehan issued him a summons for operating after suspension.

[¶ 6] Gulick moved to suppress all evidence resulting from Sheehan's request for his license, pursuant to M.R.Crim. P. 41A, claiming that Sheehan lacked a reasonable articulable suspicion to justify detaining Gulick. The District Court declined to suppress the evidence. Gulick entered a conditional guilty plea, pursuant to M.R.Crim. P. 11(a)(2), and appealed the District Court's order. The Superior Court vacated the judgment of conviction and remanded the case to the District Court for entry of judgment of acquittal. The State filed this appeal pursuant to 15 M.R.S.A. § 2115–A (1980 & Supp.1999) and M.R.Crim. P. 37B.

## II. DISCUSSION

[¶ 7] Because the Superior Court acted as an intermediate appellate court, we review directly the decision of the District Court. *See State v. Wilder,* 2000 ME 32, ¶ 19, 748 A.2d 444, 449. When the facts are not disputed, we review the District Court's conclusions for error of law.

1. Gulick told Sheehan that he had been to a rock concert and had left his license at home for fear that it would be stolen.

2. The trial court concluded that Sheehan's brief interaction with Gulick did not constitute a seizure for purposes of the Fourth Amendment. Therefore, the court never reached the question of reasonableness. The court apparently accepted, and neither party has challenged, Sheehan's presentation of the facts. Because the State has now agreed with the defendant that a stop did occur, we assume that the intrusion implicated the Fourth Amendment. We review de novo the legal conclusions of the court. *See State v. Connors,* 1999 ME 125, ¶¶ 2, 8, 734 A.2d 195, 196, 198.

3. The Maine Constitution, article 1, section 5, contains language that is for the most part identical to the U.S. Constitution. Article 1, section 5 provides, in pertinent part:

*See State v. Brown,* 675 A.2d 504, 505 (Me.1996).

[¶ 8] The resolution of this matter requires us to determine whether Sheehan's request for Gulick's license was "reasonable" for purposes of compliance with the Fourth Amendment.[2]

[¶ 9] The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .

U.S. CONST. amend. IV.[3]

[¶ 10] An encounter between a member of law enforcement and a citizen will implicate the protections of the Fourth Amendment only if the encounter constitutes a seizure of the citizen. *See State v. Moulton,* 1997 ME 228, ¶ 7, 704 A.2d 361, 363 (citing *State v. Laplante,* 534 A.2d 959, 962 (Me.1987)). A seizure occurs when the citizen's liberty is restrained by a law enforcement official such that the citizen " 'is not free to walk away.' " *State v. Preble,* 430 A.2d 553, 555 (Me.1981) (quoting *United States v. Viegas,* 639 F.2d 42, 44 (1st Cir.1981)), *quoted in State v. Cilley,* 1998 ME 34, ¶ 7, 707 A.2d 79, 82. *See also United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).[4]

The people shall be secure in their persons, houses, papers and possessions from all unreasonable searches and seizures . . . .
ME. CONST. art. 1, § 5. This language provides protections that are identical to the federal counterpart, and we have interpreted the Maine provision coextensively with the Fourth Amendment. *See, e.g., State v. Tarantino,* 587 A.2d 1095, 1098 (Me.1991) (refusing "to extend greater protection under [ME. CONST. art. 1, § 5] than that required under the [Fourth Amendment]").

4. This definition of "seizure" must be distinguished from the oft-cited definition of "arrest," which also includes the concept that the person is not "free to walk away," but does so in the context of circumstances consistent with formal arrest. *See, e.g., Thompson v. Keohane,* 516 U.S. 99, 107, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). A brief restriction on a citizen's right to walk (or drive) away is usually referred to as a detention or a

[¶ 11] Here, Sheehan did not seize Gulick merely by approaching the car and inquiring of its occupants. *See State v. Brewer,* 1999 ME 58, ¶ 12, 727 A.2d 352, 355; *Moulton,* 1997 ME 228, ¶¶ 8–13, 704 A.2d at 363–65; *Laplante,* 534 A.2d at 962.[5] The State concedes, however, that the totality of Sheehan's actions following his approach to the car—asking for the license, following up with a request for identifying information, and having Gulick wait while he ran a check on the status of Gulick's right to operate a vehicle—constituted a detention, or seizure, for Fourth Amendment purposes.[6]

[¶ 12] An officer may detain a citizen only when " 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *State v. Dulac,* 600 A.2d 1121, 1122 (Me.1992) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Using that standard, we examine the circumstances surrounding Sheehan's detention of Gulick to determine if that police action was reasonable. *See Brewer,* 1999 ME 58, ¶ 12, 727 A.2d at 355; *Moulton,* 1997 ME 228, ¶ 9, 704 A.2d at 363–64.

[¶ 13] Brief intrusions based upon reasonable and articulable (1) safety concerns, *see State v. Pinkham,* 565 A.2d 318, 319 (Me.1989); (2) suspicion that the defendant has committed a crime, *see Terry,* 392 U.S. at 21, 88 S.Ct. 1868; *State v. Mehuren,* 594 A.2d 1073, 1075 (Me.1991); or (3) suspicion that the defendant has committed a traffic infraction, *see State v. Hill,* 606 A.2d 793, 795 (Me.1992), are "reasonable" and are, therefore, not in violation of the Fourth Amendment.

[¶ 14] When Sheehan approached the vehicle he had a clearly articulated and objectively reasonable concern for the occupants' safety. "[S]afety reasons alone can be sufficient" to allow the detention of a driver if they are based on "specific and articulable facts." *Pinkham,* 565 A.2d at 319. In *Pinkham,* we concluded that "[i]f we were to insist upon suspicion of activity amounting to a criminal or civil infraction to meet the *Terry/Griffin* standard, we would be overlooking the police officer's legitimate role as a public servant to assist those in distress and to maintain and foster public safety." *Id.* Thus, Sheehan's concern for the safety of the car's occupants was sufficient to justify a brief detention of those occupants.

[¶ 15] After an officer stops a vehicle, he may request verification of the operator's right to drive, even when the original reason for a stop has disappeared, or evaporated, before the request is made. *See Hill,* 606 A.2d at 795; *State v. Huether,* 2000 ME 59, ¶¶ 6–7, 748 A.2d 993, 995. For instance, in *Hill,* the defendant's vehicle was stopped because the officer believed it did not have a visible license plate, in violation of 29 M.R.S.A. § 381 (1964), *repealed by* P.L.1993, ch. 683, § A–1 (effective Jan. 1, 1995). *See Hill,* 606 A.2d at 794. As the officer approached the defendant's truck, however, he observed an unilluminated license plate in the car's rear window. *See id.* at 794–95. The officer nevertheless approached the driver to request his license and registration. *See id.* at 794. *After* making the request, the officer observed that Hill appeared to be intoxicated. *See id.* at 795. We concluded that the officer's request to see the defen-

---

stop in order to distinguish the more limited restriction from a restriction commensurate with arrest. *See Terry v. Ohio,* 392 U.S. 1, 14–21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Wentworth,* 480 A.2d 751, 755 (Me. 1984).

**5.** *See also State v. Daniel,* 12 S.W.3d 420, 425 (Tenn.2000); *People v. Paynter,* 955 P.2d 68, 71–72 (Colo.1998).

**6.** We need not determine the precise instant of the seizure in this matter because the officer's actions were based on an initial articulable suspicion for the contact with Gulick, and the entire course of the officer's actions were limited in scope and reasonable in relation to the circumstances that initiated the contact.

dant's license was a "minimal further intrusion," and rejected the defendant's argument that the request itself must be supported independently by a reasonable articulable suspicion. *See id.* Because Hill had been validly stopped as a result of the officer's belief that the vehicle had no license plate, we concluded that the subsequent police action, although not independently supported by reasonable articulable suspicion, was justified. *See id.*

[¶ 16] In a more recent opinion, in which the original reason for the stop had evaporated before the officer ran a check on the operator's license, we set out the analysis that is necessary in these circumstances: "We first determine whether the initial stop was justified; if it was, then we look to what actions were taken during the stop to determine whether those actions were 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Huether*, 2000 ME 59, ¶ 6, 748 A.2d at 995 (quoting *Hill*, 606 A.2d at 795).

■■ [¶ 17] The only meaningful distinction between the facts before us and the facts in *Hill* or *Huether* is Sheehan's choice to approach Gulick's car without turning on his blue lights or otherwise effecting a show of force. There can be no question, however, that Sheehan was justified in approaching the lone vehicle parked in the darkened lot of a closed emergency medical care facility at almost three o'clock in the morning. Sheehan would have been justified in engaging in a seizure, or a "stop" on these facts. That he chose not to engage in an unnecessary show of force does not change the analysis.[7]

[¶ 18] Accordingly, except for the officer's decision not to turn on his vehicle's blue lights, and thereby *immediately* "detain" the operator, the analysis in *Hill* and *Huether* is applicable.[8] Because the officer did, in fact, articulate facts sufficient to engage in a brief *Terry*-like detention, the distinction between approaching Gulick's car with or without the show of force necessary to effect an immediate detention is a distinction without a difference for the purpose of this analysis. The key question is whether the officer's initial contact with the driver was justified on the basis of reasonable articulable facts sufficient to satisfy the Fourth Amendment. Having observed the car pull into the parking lot of a closed emergency medical care facility at almost three o'clock in the morning, any prudent officer would have been justified in assuring that the occupants did not have a medical or other emergency, *see Pinkham*, 565 A.2d at 319, or that illegal activity was not afoot. *See Mehuren*, 594 A.2d at 1075. Indeed, it can be argued that an officer's failure to investigate the circumstances of Gulick's presence there, and obtain identification, would have constituted a serious error in judgment.

■ [¶ 19] Because the officer was justified in approaching the driver, it was reasonable for the officer to request verification of his license to operate, before

---

7. An officer may approach a citizen and engage in a consensual conversation without effecting a detention for purposes of the Fourth Amendment, and thus need not have an "articulable suspicion" before engaging in that conversation. It does not follow, however, that the officer who *does* have an articulable suspicion must consistently engage in conduct rising to the level of a detention when he undertakes an investigatory conversation which ultimately culminates in a brief detention. The difference is that the first officer, who began the conversation *without* an articulable suspicion, may not detain the citizen (unless such suspicion actually arises); while the second officer, who began the conversation on the basis of an articulable suspicion, may undertake a detention of the citizen that is reasonably related in scope to the concerns that justified the original contact without additional justification.

Any other rule would encourage law enforcement officials who would otherwise choose not to engage in a show of force to do so in all instances where articulable suspicion is initially present. Nothing is gained, and indeed much may be lost, by an arbitrary rule that encourages the "ratcheting up" of the badges of authority.

8. *But see State v. Garland*, 482 A.2d 139 (Me. 1984).

allowing the driver to proceed. We reject Gulick's argument that the officer must be able to justify his inquiry on a question-by-question basis.[9] When the investigatory contact has already occurred (with or without a show of authority) and is founded upon the requisite reasonable articulable suspicion, the analysis regarding the continuing intrusion will turn on the *scope* of the intrusion, not on the existence or discovery of new or alternate reasons for the inquiry. *See Huether,* 2000 ME 59, ¶ 8, 748 A.2d at 995–96.

[¶ 20] Sheehan's request for verification of Gulick's right to operate the vehicle was reasonably related in scope to the original justification for the contact. The minimal further intrusion that resulted from the officer's request was directly related to the operation of the vehicle. The request for verification of Gulick's right to drive was neither excessive nor beyond what an ordinary driver would expect. The State's efforts to assure that only licensed operators are present on our roads is crucial to the safety of the public.[10] The Legislature has therefore required that any person who operates a motor vehicle on public ways must be licensed to operate that vehicle and must carry evidence of that license on him or her when driving the vehicle. *See* 29–A M.R.S.A. § 1251 (1996 & Supp.1999).

When balancing the significance of the public concern served by the license check against the relatively minimal intrusion of the driver's liberty interests, *see Hill,* 606 A.2d at 795–96, we conclude that Sheehan's actions did not exceed the scope justified under the circumstances.

 [¶ 21] Thus we hold that a detention related to a request by a law enforcement official that a motor vehicle operator demonstrate that the operator is licensed to drive is not an unreasonable intrusion *when the officer's initial contact with the operator is based on reasonable and articulable facts* of a concern for safety or wrongdoing, whether or not the initial contact itself constituted a seizure.[11]

[¶ 22] Because Sheehan presented a reasonable and articulable suspicion of a safety problem, the District Court did not err when it denied Gulick's motion to suppress the evidence related to his license suspension.

The entry is:

Judgment of the Superior Court vacated. Remanded to the Superior Court for remand to the District Court for entry of judgment of conviction.

9. The entire incident here occurred in a matter of minutes. The officer pulled in behind the Gulick car, walked to the window, inquired of the occupants' situation, and asked Gulick for his license. To parse out the actions of the officer so that his state of mind in the instant before he asked for the license becomes key to the request is both contrary to common sense and violative of the Supreme Court's instructions to consider all the objective facts available to the officer at the time of the detention. *See Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868. As we concluded implicitly in *Hill* and *Huether,* it is unrealistic and counterproductive to require law enforcement to stop at each new question to determine whether articulable suspicion has "evaporated." The question instead is whether the officer's conduct in detaining the driver is within the scope of the original justification for the stop.

10. "States have a valid interest in ensuring that only those qualified to do so are permit-

ted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed ." *Delaware v. Prouse,* 440 U.S. 648, 658, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (concluding that "discretionary spot checks," that is, random stops not based on individualized suspicion, do not serve that goal).

11. Mere casual, incidental, or random contact with drivers of stopped vehicles will not suffice to fulfill that element. Only that level of suspicion that would justify an actual detention for purposes of the Fourth Amendment will suffice. Courts must be vigilant in assuring that the rubric of a "safety approach" does not devolve into an excuse for random, or purely discretionary seizures. *See Prouse,* 440 U.S. at 659, 99 S.Ct. 1391.