2009 UT App 181

STATE of Utah, Plaintiff and Appellee,

v.

Vance MORRIS, Defendant and Appellant.

No. 20080497–CA.

Court of Appeals of Utah.

July 2, 2009.

Rehearing Denied Aug. 10, 2009.

---

Ronald J. Yengich and Elizabeth Hunt, Salt Lake City, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Jeffrey S. Gray, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before Judges GREENWOOD, ORME, and McHUGH.

## OPINION

GREENWOOD, Presiding Judge:

¶1 Defendant Vance Morris appeals the trial court's denial of his motion to suppress evidence obtained as a result of a traffic stop. Because we determine that any reasonable suspicion of crime had dissipated before the police officer approached Mr. Morris's car window, we conclude that Mr. Morris was unreasonably seized and, accordingly, that the trial court erred in denying his motion to suppress evidence found as a result of this unjustified police detention. We reverse and remand for proceedings consistent with this opinion.

## BACKGROUND

¶ 2 At approximately 9:30 p.m. on June 12, 2007, Mr. Morris was driving a black Mazda SUV (the SUV) on a two-lane highway in rural San Juan County, Utah. While driving behind the SUV, Utah Highway Patrol Trooper Travis Williams became suspicious and began recording the SUV's driving pattern from his dashboard video camera. After following the SUV for a couple of minutes, Trooper Williams initiated a traffic stop because the SUV had "no visible license plate" and it "was constantly bumping the [white] fog line" on the road, "especially when other cars were passing."

¶ 3 As the vehicles pulled to the side of the road, Trooper Williams shone his vehicle's spotlight on the back of the SUV, illuminating a piece of paper taped to the SUV's back window. Some time between exiting his vehicle and approaching the SUV, Trooper Williams identified this piece of paper as a temporary vehicle registration permit for the SUV. Nevertheless, Trooper Williams approached the SUV's driver's side window and stated:

> The reason I stopped you—there's a couple of reasons. First off, I couldn't see your license plate before, but I see it now. I see that you got that temporary tag. Okay, secondly, I kept seeing you bump that white [fog] line just kind of going along, especially when other cars were passing.

Mr. Morris did not deny bumping the fog line; rather, he "explained that there were a lot of ruts in the road and that the tire pressure in his back tire was a little low." As the conversation continued, Mr. Morris offered his driver license, registration, and proof of insurance to Trooper Williams, who then directed Mr. Morris to exit the SUV. After Mr. Morris reached the rear of the SUV, Trooper Williams stated that he could "smell the odor of an alcoholic beverage," and asked Mr. Morris if he had recently had

anything to drink. Mr. Morris said he had not. In apparent disbelief, Trooper Williams reiterated that he was "getting a slight whiff of an alcoholic beverage," extended his arm, cupped his hand, and asked Mr. Morris to blow into it. Upon then smelling his hand, Trooper Williams stated that he detected a "very strong odor of an alcoholic beverage," and proceeded to administer field sobriety tests to Mr. Morris.

¶ 4 After Mr. Morris failed these tests, Trooper Williams arrested him for driving under the influence of drugs or alcohol (DUI) and transported him to the county jail. Incident to Mr. Morris's arrest, drugs and drug paraphernalia were discovered during an inventory search of the SUV. As a result, Mr. Morris was formally charged with several drug- and alcohol-related crimes, including DUI. Mr. Morris filed a motion to suppress the evidence seized as a result of the traffic stop and, in support thereof, offered into evidence a DVD copy of the video taken from Trooper Williams's dashboard video camera (the Video). The trial court denied Mr. Morris's motion, stating that even if Trooper Williams's reasonable suspicion dissipated before he reached the SUV's window, he was still justified in doing so, and once there, further detention was justified because this initial contact "generated [new] reasonable suspicion of criminal activity." Reserving the right to appeal the trial court's denial of his motion to suppress, Mr. Morris entered a conditional guilty plea to possession of a controlled substance with intent to distribute, a second degree felony, *see* Utah Code Ann. § 58–37–8(1)(a)(iii) (Supp.2008), and possession of drug paraphernalia, a class B misdemeanor, *see id.* § 58–37a–5(1). This appeal followed.

## ISSUE AND STANDARD OF REVIEW [1]

¶ 5 The sole issue on appeal is whether the trial court erred in denying Mr. Morris's

---

1. Mr. Morris also urges this court to conclude that the frisk of Mr. Morris was unconstitutional, in that it exceeded the permissible scope of a DUI investigation in the event such an investigation was warranted. However, we do not address this issue because (1) our decision that Trooper Williams impermissibly seized Mr. Mor-

ris by detaining and investigating him without reasonable suspicion of a crime makes analysis of this issue unnecessary, and (2) the only evidence discovered as a result of this frisk was a pocket knife, which has not been offered as evidence of any crime and thus does not need to be suppressed.

motion to suppress the evidence discovered as a result of the traffic stop. A trial court's decision to deny a motion to suppress evidence presents a mixed question of law and fact: We review the trial court's factual findings for clear error, *see State v. Krukowski*, 2004 UT 94, ¶ 11, 100 P.3d 1222, and its legal conclusions, including its application of the legal standard to the facts, non-deferentially for correctness, *see State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699.

## ANALYSIS

¶ 6 The Fourth Amendment to the United States Constitution protects citizens "against unreasonable searches and seizures." U.S. Const. amend. IV. "The stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment." *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir.1994) (additional internal quotation marks omitted). To be reasonable, such a seizure must be "[1] . . . justified at its inception, and [2] . . . reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (internal quotation marks omitted). Because these elements are listed in the conjunctive, failure on either element renders the seizure unreasonable. *See id.*

¶ 7 We thus look first at whether the traffic stop was justified at its inception. "[A] police officer is constitutionally justified in stopping a vehicle if the stop is 'incident to a traffic violation committed in the officer's presence.'" *State v. Lopez*, 873 P.2d 1127, 1132 (Utah 1994) (quoting *State v. Talbot*, 792 P.2d 489, 491 (Utah Ct.App.1990)). And if the officer does not observe a traffic violation, a vehicle stop may still be justified if "specific, articulable facts and reasonable inferences derived from th[o]se facts . . . would lead a reasonable officer to conclude that the occupant of the vehicle had committed, or was about to commit a crime." *State v.*

*Bello*, 871 P.2d 584, 586 (Utah Ct.App.1994). However, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *see also State v. Hansen*, 2002 UT 125, ¶ 31, 63 P.3d 650 (citing *Royer*).

¶ 8 Trooper Williams asserted two justifications for stopping Mr. Morris: Mr. Morris's driving pattern (i.e., bumping the white fog line especially when cars were passing) and Mr. Morris's failure to display a valid license plate. The State concedes on appeal, as it did before the trial court, that Mr. Morris's driving pattern does not "justify the [traffic] stop solely on improper lane travel." [2] In denying Mr. Morris's motion to suppress, the trial court likewise "agree[d] that it is debatable whether Mr. Morris'[s] driving pattern justified a traffic stop." We agree with the trial court and accept the State's concession, noting that the Video supports the conclusion that Mr. Morris's driving pattern did not provide Trooper Williams with reasonable suspicion of improper lane travel sufficient to justify initiation of the traffic stop. *See* Utah Code Ann. § 41–6a–710(1)(a) (2005) (requiring motorists to "keep the vehicle as nearly as practical entirely within a single lane"); *Bello*, 871 P.2d at 587 (addressing an earlier version of Utah Code section 41–6a–710 and concluding that one instance of briefly crossing the center line of a highway followed by two minutes of no swerving was not sufficient enough to constitute a violation of the statute, requiring "only that a vehicle remain entirely in a single lane 'as nearly as practical' ").[3]

¶ 9 The only remaining asserted justification for the traffic stop was the absence of a visible license plate, which was dispelled when Trooper Williams exited his vehicle and

---

**2.** The State does maintain, however, that Mr. Morris's driving pattern is relevant to Trooper Williams's DUI probable cause determination once at the window of the SUV.

**3.** Indeed, moving as far to the right in his lane as possible, as cars approached and passed him at night on a narrow two-lane road, seems more prudent than suspect, even if it meant "bumping" the white fog line painted on the asphalt surface.

saw the temporary permit while approaching the SUV.[4] This fact is evidenced by listening to Trooper Williams's initial interaction with Mr. Morris, wherein he states that before reaching the SUV's window he was able to see the temporary permit. Thus, according to Trooper Williams's own statement, before he had reached the SUV's window he no longer "ha[d] reasonable articulable suspicion that [Mr. Morris] [wa]s committing a traffic offense." *See Lopez,* 873 P.2d at 1132 (internal quotation marks omitted).

¶ 10 The State argues that the traffic stop was justified at its inception because Trooper Williams could not see the temporary permit when he signaled Mr. Morris to pull the SUV to the side of the road.[5] The State further contends that, regardless of when Trooper Williams actually recognized the temporary permit, he was justified in approaching the SUV window to explain his mistake. In support, the State cites *United States v. McSwain,* 29 F.3d 558 (10th Cir.1994), wherein the Tenth Circuit Court of Appeals stated, in dicta, that a police officer may, "[a]s a matter of courtesy," explain to an erroneously stopped driver the mistaken reason for the stop, before "allow[ing] them to continue on their way." *Id.* at 562. The State urges us to adopt this as the policy in cases, such as the present case, where a driver is mistakenly pulled over. Mr. Morris, on the other hand, emphasizes that *McSwain* is not binding on this court and

argues that adoption of the *McSwain* dicta would be contrary to well-settled Utah precedent prohibiting continued police detention once reasonable suspicion has dissipated. For reasons discussed more thoroughly below, we agree with Mr. Morris and decline to adopt the *McSwain* dicta.

¶ 11 The United States Supreme Court recently reiterated that Fourth Amendment analyses should always begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant,* — U.S. ——, ——, 129 S.Ct. 1710, 1716, 173 L.Ed.2d 485 (2009) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). And Utah law makes clear that any police detention must be justified by reasonable suspicion of a crime; police detention is no longer justified after reasonable suspicion dissipates. *See State v. Hansen,* 2002 UT 125, ¶ 31, 63 P.3d 650 (stating that once the reason for the traffic stop has been resolved, i.e., reasonable suspicion has dissipated, "[a]ny further temporary detention ... constitutes an illegal seizure"). The State argues, much as the government did in *McSwain,* that our decision today "will require the officer to stop a vehicle, approach the vehicle on foot, observe it, then walk

---

**4.** For purpose of our analysis we accept the State's position that Trooper Williams did not see Mr. Morris's temporary permit until after he exited his police vehicle. As we explain more fully later in the *Analysis,* the exact timing of when Trooper Williams first noticed the temporary permit is not critical, so long as it was prior to his initial interaction with Mr. Morris. However, we note that the Video shows the temporary permit clearly illuminated when Trooper Williams, still in his vehicle, shone his spotlight on the back of the SUV: The trial court also noted in its ruling that the temporary permit was visible at that time. Regardless, we assume that Trooper Williams first noticed the presence of the temporary permit prior to reaching the SUV window, which is all that is necessary for our decision.

**5.** The State also argued before the trial court that the traffic stop was valid at its inception because the temporary permit did not meet the requirements of Utah Code section 41–1a–403, *see* Utah

Code Ann. § 41–1a–403 (Supp.2008) (requiring permanent license plates to be legible from 100 feet). Noting that neither party "ha[d] cited a statutory provision which distinguishes between the requirements for display of temporary [license] plates and permanent plates," the trial court ruled that under the statutes governing display of permanent license plates the traffic stop was justified because Mr. Morris's temporary permit "was taped to the rear window [of the SUV,] was not illuminated, and, [when the traffic stop occurred], was neither visible nor legible until [Trooper] Williams shined his spotlight on it." Mr. Morris has presented this court with a detailed comparison of the statutory schemes governing these different types of plates, concluding that the display requirements for permanent license plates do not apply to temporary permits, and the State has abandoned that argument on appeal. We thus do not analyze that argument herein.

away, get in his police car, drive away and wave, leaving the stopped citizen to wonder what had just occurred." *McSwain*, 29 F.3d at 562. While we recognize the potential for momentary motorist confusion, we believe this fleeting perplexity will just as certainly be quickly supplanted with relief at the avoidance of any negative repercussions potentially stemming from a traffic stop. Moreover, we do not find the avoidance of individual bewilderment—nor the promotion of police politeness—to be a significant enough concern to "outweigh the countervailing interest that all individuals share in having their constitutional rights fully protected," *see Gant*, 129 S.Ct. at 1723, including the right to be free from unwarranted police detention, no matter how brief.[6] Accordingly, we decline to adopt the *McSwain* dicta and hold, consistent with Utah precedent and *Gant*, that a police detention is no longer justified *as soon as* the exception initially justifying the intrusion is absent.

¶ 12 We further note that, regardless of *McSwain's* dicta, application of the holding in *McSwain*—which we find to be a more accurate and sound statement of the law—is completely contrary to the State's position in the present case.[7] In *McSwain*, the police officer pulled the defendant's vehicle over because the officer was unable "to verify the validity of the temporary [registration] sticker" on the defendant's car. 29 F.3d at 560.

The officer "observed that the [temporary] sticker was valid and had not expired" before he approached the driver's side window of the defendant's car. *Id.* Despite this realization, the officer approached the driver's side window, commented about the sticker, and detained and investigated the defendant. *See id.* The *McSwain* court noted that this was not a "consensual encounter" because the officer pulled the defendant's vehicle over and began asking questions and making requests of the defendant such that "a 'reasonable person would [not] feel free to disregard the [officer] and go about his business.'" *Id.* at 562 n. 1 (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). Since this was not a consensual encounter, the officer's detention of the defendant could only be justified by "objectively reasonable articulable suspicion" of a crime. *See id.* at 561. Because the officer's "reasonable suspicion regarding the validity of [the defendant's] temporary registration sticker was completely dispelled *prior* to the time he questioned [the defendant]," the *McSwain* court held that the officer's "actions ... exceeded the limits of a lawful investigative detention and violated the Fourth Amendment." *Id.*

¶ 13 Just as in *McSwain*, Trooper Williams pulled Mr. Morris over because of concerns regarding the validity of the SUV's registration, which concerns were completely dis-

---

**6.** We also note that adoption of the *McSwain* dicta has the potential to broaden the "traffic stop" exception to the Fourth Amendment to the extent that it swallows the rule. Without questioning the integrity or professionalism of police officers, we fear that adoption of the *McSwain* dicta would provide an incentive for questionable traffic stops and long-winded apologies, all in the hopes of potentially, as in this case, "getting a slight whiff of an alcoholic beverage." *Cf. State v. Chatton*, 11 Ohio St.3d 59, 463 N.E.2d 1237, 1239–40 (1984) (discussing "the potential for abuse" if officers are allowed to continue to detain and investigate drivers even after the reasonable suspicion initially justifying the traffic stop has dissipated), *superseded by statute as stated in State v. Phillips*, 155 Ohio App.3d 149, 2003–Ohio–5742, 799 N.E.2d 653, at ¶ 17.

**7.** While not necessarily dispositive, we note that numerous state's courts have held, consistent with the holding in *United States v. McSwain*, 29 F.3d 558 (10th Cir.1994), "that when an officer reasonably but mistakenly stops a vehicle that he believes has violated a traffic law, upon discover-

ing that the stopped vehicle is *not* in violation of the law, the officer no longer has any authority to further detain the driver." *McGaughey v. State*, 2001 OK CR 33, ¶ 31, 37 P.3d 130; *see also, e.g., People v. Redinger*, 906 P.2d 81, 85–86 (Colo. 1995); *Powell v. State*, 649 So.2d 888, 889 (Fla. Dist.Ct.App.1995); *Chatton*, 463 N.E.2d at 1239–40. And despite the Tenth Circuit's continued application of the *McSwain* dicta, *cf. United States v. Edgerton*, 438 F.3d 1043, 1051 (10th Cir.2006) (stating, in dicta and without further discussion, that *McSwain* mandates a courteous explanation by the officer following an unjustified traffic stop), we have found no such consensus regarding its adoption in other jurisdictions, *but cf. State v. Gulick*, 2000 ME 170, ¶ 15, 759 A.2d 1085 (holding somewhat consistently with the *McSwain* dicta: "After an officer stops a vehicle, he may request verification of the operator's right to drive, even when the original reason for a stop has disappeared, or evaporated, before the request is made").

pelled prior to his initial interaction with Mr. Morris. Trooper Williams nevertheless approached Mr. Morris; made comments about why he initiated the traffic stop; accepted Mr. Morris's identification, registration, and proof of insurance; requested that Mr. Morris exit the SUV; and otherwise detained and investigated Mr. Morris. Because this interaction was not a consensual encounter, *see Bostick*, 501 U.S. at 434, 111 S.Ct. 2382, and Trooper Williams no longer had any reasonable, articulable suspicion of criminal activity, his actions "exceeded the limits of a lawful investigative detention and violated the Fourth Amendment." *See McSwain*, 29 F.3d at 561.

## CONCLUSION

¶ 14 Because we determine that any reasonable suspicion initially justifying the initiation of the traffic stop of Mr. Morris had dissipated before Trooper Williams reached the SUV's window, we conclude that the resulting detention was unjustified. Accordingly, we conclude that the trial court erred in denying Mr. Morris's motion to suppress, and reverse and remand for further proceedings consistent with this opinion.

¶ 15 I CONCUR: CAROLYN B. McHUGH, Judge.

ORME, Judge (concurring):

¶ 16 I concur in the court's opinion. Those who were at oral argument in this case may find that surprising, as it would have seemed obvious to those in attendance that I inclined to the view that an officer, like the one in this case, should be permitted to approach a motorist and apologize for his mistake. It seemed to me that an explanation and apology would be simple good manners on the officer's part, as well as a prudent means of staving off a potential harassment complaint from the annoyed motorist who might otherwise conclude he had been "messed with" for no good reason.

¶ 17 The compelling logic of the lead opinion persuades me to the contrary view. And I would add that it will be an exceedingly rare circumstance when the motorist would fail to know the precise reason that the stop had been aborted. Those with temporary paper permits or renewals taped to their cars' windows know such documents are there and know that the details thereon will not be observable from any distance. If pulled over by an officer who gets back in his car and drives off upon getting within reading range of the paper permit or renewal, they will immediately figure out what happened. The same is true for a driver pulled over in the "HOV" lane of the freeway, whose diminutive back-seat passengers are not observable until the officer walks alongside the car. Even in the rare case when a motorist has no clue why he was stopped, the motorist will invariably conclude that an officer who gets back in his patrol car and drives off has just noticed behavior more egregious than whatever it was the stopped motorist had done, or that the officer has been called to an emergency more pressing than a routine traffic matter.

¶ 18 In short, I agree the Fourth Amendment does not allow officers to prolong a flawed encounter by lingering to explain why it should not have been commenced in the first place. And totally aside from Fourth Amendment jurisprudence, under any scenario I can envision a motorist will be nothing less than overjoyed that an officer, having stopped the motorist's vehicle for whatever reason, has thought the better of it and decided to be on his way. No explanation required; no apology needed.