**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 03-2630

UNITED STATES,
Plaintiff, Appellee,

v.

ONE PARCEL OF REAL PROPERTY WITH BUILDINGS, APPURTENANCES
AND IMPROVEMENTS KNOWN AS 45 CLAREMONT ST., LOCATED IN THE
CITY OF CENTRAL FALLS, RHODE ISLAND,
Defendant,

MARIA BENAVIDES,
Claimant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Stahl, Senior Circuit Judge.

Peter P. D'Amico, D'Amico & Testa, and Debra A. Howson for
appellant.
Michael P. Iannotti, Assistant United States Attorney, and
Craig N. Moore, United States Attorney, for appellee.

September 21, 2004

**Per curiam**.        Claimant-appellant Maria Benavides ("Benavides") appeals from the district court's forfeiture of her real property.  Finding no error, we affirm the district court's ruling.

## I. BACKGROUND

Benavides purchased the property at issue, a three-family dwelling located at 45 Claremont Street in Central Falls, Rhode Island, on March 22, 2001.  The first floor became the residence for Benavides, her boyfriend Shawn Montegio ("Montegio"), and their four children.  The remaining two units were rented to others.

Despite Montegio's relatively modest annual income, Benavides knew that he consistently had a significant amount of money at his disposal.  It was Montegio who provided Benavides with $19,000 in cash towards her down payment for the property.  In addition, Montegio spent $12,000 in renovations to the property, and he also gave Benavides a $4,400 Rolex watch and most of the $9,000 that she used to buy a 2000 Ford Windstar.[1]  Benavides, moreover, was aware that Montegio had served a prison sentence for a drug-related offense.

In November 2002, law enforcement agents, suspecting Montegio of drug involvement, began monitoring his telephone conversations.  On January 13, 2003, agents intercepted a

---

[1]Benavides only admitted that Montegio gave her most of the money to buy the Windstar after she was presented with evidence that she could not possibly have purchased it on her modest salary.

conversation between Montegio and Jorge Ferreras ("Ferreras") in which they discussed the sale of cocaine by Ferreras to Montegio. The next day, numerous calls pertaining to the sale were monitored. Many of the calls took place within minutes of one another. During one call, Benavides talked to her cousin, Jessica Olivares ("Olivares"), about how best to transport boxes (later determined to contain cash) to Montegio that Olivares was storing for him at her residence. Benavides suggested that, to avoid arousing Olivares' mother's suspicion, Olivares put the boxes in a bag and tell her mother that the bag contained clothes for Benavides' children.

On January 15, 2003, the transaction between Montegio and Ferreras took place. That evening, a call from Ferreras to Montegio was intercepted during which Benavides functioned as a Spanish-English translator for Montegio. Ferreras complained that "135" was missing, and even though neither Ferreras nor Montegio had mentioned the word "dollars," Benavides added the word "dollars" to her translation.

Benavides was also heard in additional intercepted calls that concerned drug transactions involving Montegio. For instance, on January 27, 2003, Montegio and Julio Jaiman ("Jaiman") spoke several times about a cocaine transaction. One minute after Montegio called Jaiman, he called Benavides and stated, "that kid

-3-

went home." Benavides' response to that statement was simply, "okay."

On February 8, 2003, a call between Montegio and Francisco Jose Bermudez ("Bermudez") was intercepted. During the call, there was discussion of the purchase by Montegio of nine kilograms of cocaine. At one point in the conversation, Montegio asked Benavides to translate Bermudez's statements from Spanish to English. Once again, rather than providing literal translations of Bermudez's statements, Benavides, on more than one occasion, added and subtracted words. For example, Bermudez said the following to Benavides: "Tell him that if he can give me something ahead, in advance, because since it's the new family then you understand me." Benavides translated that statement as, "He's going to need some ahead because it's the different people that he's dealing with."

On February 9, 2003, shortly after 7:00 p.m., the sale between Montegio and Bermudez occurred in the kitchen at 45 Claremont Street. During the transaction, which took a little over an hour, Benavides and her four children remained in the living room, a room separated from the kitchen by the dining room. From the living room, it was not possible to reach the only bathroom in the first-floor apartment without first passing through the kitchen.

At about 8:00 p.m., law enforcement agents entered the first-floor apartment. At trial, two of the agents testified that the smell of cocaine pervaded the premises.

When the agents entered the house, Montegio ran from the kitchen toward the bathroom, holding a loaded, nine-millimeter gun, which he tossed in the toilet. In the kitchen, the agents found the following: (1) nine kilograms of cocaine on the toaster oven; (2) $115,000 in cash on the center island; (3) several kilogram wrappers in the sink; and (4) a scale and plastic-bag sealer on a counter.

On March 11, 2003, the government filed a complaint for forfeiture against the property located at 45 Claremont Street. On April 21, 2003, Benavides filed her claim to the property.

On October 31, 2003, following a bench trial, the district court entered judgment in favor of the government. Benavides filed a timely appeal. On appeal, she raises the following issues: (1) whether the district court erred in finding that she was not an innocent owner; and (2) whether the forfeiture of her home violates the Excessive Fines Clause of the Eighth Amendment.

## II. INNOCENT OWNER DEFENSE

Benavides first contends that the district court's forfeiture order was erroneous because she was an innocent owner. When a district court conducts a bench trial, its factual findings

-5-

are entitled to "considerable deference." See, e.g., United States v. 15 Bosworth St., 236 F.3d 50, 53 (1st Cir. 2001); see also United States v. Iacaboni, 363 F.3d 1, 7 (1st Cir. 2004) (noting that "great deference" is extended to findings based on a credibility determination). A district court's legal determinations, however, are reviewed de novo. See, e.g., 15 Bosworth St., 236 F.3d at 53.

To carry its burden in a civil forfeiture action, the government must satisfy the requirements of both the applicable forfeiture statute and the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), the relevant portions of which have been codified in 18 U.S.C. § 983(c).[2] The applicable forfeiture statute, 21 U.S.C. § 881(a), provides, in relevant part:

> The following shall be subject to forfeiture to the United States and no property right shall exist in them:
> . . . .
> (7) All real property . . . used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment.

Moreover, in a suit or action brought under any civil forfeiture statute, § 983(c)(1) states that "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." Section 983(c)(3) further

---

[2]CAFRA applies to forfeiture proceedings commenced on or after August 23, 2000. See Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, § 21, 114 Stat. 202, 225.

provides that, "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."

Yet, even if the government satisfies the requirements of §§ 881(a)(7) and 983(c), it does not necessarily follow that there will be a forfeiture. Section 983(d) contains an innocent owner defense that provides, in relevant part:

> (1) An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.
> (2)(A) With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term "innocent owner" means an owner who—
> (i) did not know of the conduct giving rise to forfeiture . . . .[3]

In this case, the district court determined that the government carried its burden of proving that the property in question was subject to forfeiture pursuant to § 881(a)(7). Benavides does not question that determination on appeal.

---

[3] Prior to its amendment in 2000, § 881(a)(7) contained its own innocent owner defense. Although, when the parties and the district court refer to the innocent owner defense, they at times refer to the language of the pre-2000 version of § 881(a)(7), § 983(d)'s codification of the innocent owner defense applies in this case, as the forfeiture action was commenced after August 23, 2000. The error, however, is not determinative.

At trial, Benavides claimed that she was an innocent owner. Although the parties did not dispute Benavides' ownership interest in the property, what they disputed was whether she had knowledge of the event that gave rise to this forfeiture action-- the February 9 transaction. Benavides, thus, had to prove that she lacked knowledge of the transaction to be entitled to the protections of the innocent owner defense. Benavides relied on her own testimony to carry her burden.

The district court ruled that Benavides failed to carry her burden. The ruling was based, in large part, on its belief that Benavides was not a credible witness. We find that the trial record sufficiently supports the district court's ruling.

First, we review the details of the February 9 transaction. The smell of nine kilograms of cocaine would have been impossible for Benavides to miss. In addition, it is unlikely that Montegio would have left the cocaine, a scale, a plastic-bag sealer, kilogram wrappers, and $115,000 in cash in open view in the kitchen, for a little over an hour, if Benavides had not known of the transaction. The fact that Benavides and her children could not reach the only bathroom in the apartment without going through the kitchen adds to the likelihood that she knew of the transaction.

Second, recorded phone conversations pertaining to both the February 9 transaction and other drug transactions further

support the district court's ruling. Although Benavides testified that her participation in those calls was limited to her role as a translator, and that she had no knowledge of the subject matter of the conversations, the district court reasonably found that her testimony lacked credibility. Benavides evidenced an awareness of the drug-related nature of the conversations in the following ways: (1) by adding her own thoughts and information to her translations; (2) by appearing to understand seemingly meaningless words and phrases; and (3) on one occasion, by arranging to acquire the cash that was used to purchase drugs.

Third, we note Benavides' knowledge of both Montegio's prior conviction of a drug-related offense and the significant amount of money that he regularly had at his disposal. Of additional importance is the fact that the district court, in making a credibility judgment, noted that Benavides did not testify truthfully about how she obtained the money to buy the Windstar in her deposition or at trial.

The burden in this case was not on the government to establish that Benavides had knowledge of the February 9 transaction; to the contrary, it was on Benavides to establish that she lacked knowledge of the transaction. The evidence presented at trial adequately supports the district court's conclusion that Benavides failed to carry her burden. We, therefore, affirm the

district court's refusal to allow Benavides to invoke the innocent owner defense.

### III. EIGHTH AMENDMENT

Benavides next asserts that the forfeiture sought in this case violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.[4]  The factual findings made by the district court in conducting the excessiveness inquiry  must be accepted unless clearly erroneous.  United States v. Bajakajian, 524 U.S. 321, 337 n.10 (1998).  The question of whether the forfeiture here is constitutionally excessive is reviewed de novo. See id.

In Austin v. United States, 509 U.S. 602 (1993), the Supreme Court held that an in rem civil forfeiture action pursuant to 21 U.S.C. § 881(a)(7) was subject to the Excessive Fines Clause, but left it for the lower courts to decide what factors should be used to determine whether a forfeiture is constitutionally excessive. See id. at 618, 622-23.  Three tests have surfaced for making this determination: (1) the "instrumentality" or "nexus" test, (2) the "proportionality" test, and (3) the "hybrid instrumentality-proportionality" test.  See United States v. 221 Dana Ave., 81 F. Supp. 2d 182, 190-91 (D. Mass. 2000), vacated on other grounds, 261 F.3d 65 (1st Cir. 2001); United States v. 40

---

[4]The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

Clark Rd., 52 F. Supp. 2d 254, 267 (D. Mass. 1999); United States v. 154 Manley Rd., 4 F. Supp. 2d 65, 67-70 (D.R.I. 1998).

The "instrumentality" test focuses on the connection between the alleged wrong and the property subject to forfeiture.[5] See, e.g., 221 Dana Ave., 81 F. Supp. 2d at 190. The proportionality test, on the other hand, compares "the harshness of the forfeiture with the severity of the crime." See, e.g., id. The hybrid test, as its name suggests, combines the two. See, e.g., id.

In Bajakajian, the Supreme Court adopted the proportionality approach in a case involving an in personam criminal forfeiture action. See 524 U.S. at 333-34. The Court held that a forfeiture violates the Excessive Fines Clause if it is "grossly disproportional to the gravity of the defendant's offense." Id. at 324. Although noting that "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise," the Court looked to the following in evaluating proportionality: (1) whether the offense is related to other illegal activities; (2) the potential penalties

---

[5]After CAFRA, in order for the government to prove that property used to facilitate a drug transaction is subject to forfeiture, it must prove there is a substantial connection between the property and the crime. See 18 U.S.C. § 983(c)(3). Thus, once the government has met its burden, the instrumentality test is satisfied.

-11-

for the offense; and (3) the harm caused by the offense.  See id. at 337-40.

The Supreme Court has not directly addressed whether the "grossly disproportional" standard applies to in rem civil forfeiture actions.  However, in adopting the proportionality test in Bajakajian, the Court focused on the punitive nature of the forfeiture at issue, noting that "the test for the excessiveness of a punitive forfeiture involves solely a proportionality determination."  Id. at 333-34 (emphasis added).  And, in applying the Excessive Fines Clause to civil in rem forfeiture actions in Austin, the Court stated that "the question is not . . . whether forfeiture under [§ 881(a)(7)] is civil or criminal, but rather whether it is punishment."  509 U.S. at 610 (emphasis added).  We, thus, join almost all of our sister circuits in deciding that the punitive nature of civil in rem forfeitures under § 881(a)(7) warrants application of the "grossly disproportional" standard to determine whether a forfeiture violates the Excessive Fines Clause. See, e.g., United States v. Collado, 348 F.3d 323, 328 (2d Cir. 2003); United States v. Wagoner County Real Estate, 278 F.3d 1091, 1099-100 (10th Cir. 2002); United States v. Ahmad, 213 F.3d 805, 816 n.4 (4th Cir.), cert. denied, 531 U.S. 1014 (2000).[6]

---

[6]   See also United States v. 817 N.E. 29th Drive, 175 F.3d 1304, 1309 (11th Cir. 1999); Towers v. City of Chicago, 173 F.3d 619, 625-26 (7th Cir.), cert. denied, 528 U.S. 874 (1999); United States v. 3814 N.W. Thurman St., 164 F.3d 1191, 1197 (9th Cir. 1999); Yskamp v. Drug Enforcement Admin., 163 F.3d 767, 773 (3d

-12-

Therefore, the question is whether the harshness of the forfeiture is grossly disproportional to the gravity of the crime. Here, the harshness of the forfeiture is significant. Benavides lives at the property, which has a fair market value of approximately $200,000, with her four young children, and she rents out the two upper-floor apartments for extra income. These factors, however, are outweighed by Benavides' culpability and the gravity of the crime giving rise to the forfeiture.

Benavides was not an innocent owner. The evidence at trial showed that she was directly involved in the February 9 transaction, as well as several other drug transactions arranged by Montegio. See supra. Moreover, the February 9 transaction involved nine kilograms of cocaine, with a wholesale value of approximately $200,000, and a street value of more than one million dollars. The penalty for the crime from which this forfeiture action arises is high--up to life imprisonment and over four million dollars in fines. The harshness of the forfeiture is not "grossly disproportional" to the gravity of the offense.

**Affirmed.**

---

Cir. 1998); United States v. E. 415 Mitchell Ave., 149 F.3d 472, 476-77 (6th Cir. 1998).