MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2026 ME 24
Docket:        Pen-25-245
Argued:        January 7, 2026
Decided:       March 10, 2026

Panel:         STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

STATE OF MAINE

v.

JOSHUA MARTIN

CONNORS, J.

[¶1]  Joshua Martin appeals from his judgment of conviction entered by the trial court (Penobscot County, *Roberts, J.*) following his conditional plea after the court denied his motion to suppress evidence.  On appeal, Martin challenges the denial of his motion, including the court's reconsideration of its initial ruling granting the motion.  He also appeals from the trial court's forfeiture order.  We affirm.

## I.  BACKGROUND

[¶2]  In January 2023, Martin was indicted on two counts of aggravated trafficking of scheduled drugs (Class A), 17-A M.R.S. § 1105-A(1)(G), (M) (2025); unlawful trafficking in scheduled drugs (Class B), 17-A M.R.S. § 1103(1-A)(A) (2025); unlawful possession of a scheduled drug (Class D),

17-A M.R.S. § 1107-A(1)(C) (2025); failure to provide a correct name, address, and date of birth (Class E), 17-A M.R.S. § 15-A(2) (2025); violation of a condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2025); and criminal forfeiture of property, 15 M.R.S. § 5826 (2022).[1]  The charges derived from an encounter between Martin and two police officers leading to Martin's arrest in the parking lot of a Burger King in Brewer in November 2022.

[¶3]  On April 26, 2024, Martin filed his motion to suppress, and two months later he filed a petition for the return of $2,862 that had been seized from his wallet.

## A.    The Evidentiary Hearing on Martin's Motion to Suppress

[¶4]  The hearing on Martin's motion to suppress was held in June 2024. The court heard testimony from the officers who searched and arrested Martin and received into evidence the officers' body camera footage and a recording of the 9-1-1 call leading to the search and arrest.  That evidence[2] reflects the following.

---

[1]  Title 15 M.R.S. § 5826 has since been amended.  *See* P.L. 2023, ch. 196, § 1 (effective Oct. 25. 2023) (codified at 15 M.R.S. § 5826(6) (2025)).

[2]  "Our review of the denial of a motion to suppress is limited to the record on which the court made its ruling."  *State v. Barclift*, 2022 ME 50, ¶ 9, 282 A.3d 607.

[¶5]  On November 21, 2022, the manager of a Burger King called 9-1-1 to report that he had seen an individual come through the drive-through with an "open container," described as a Twisted Tea with a straw in it.  The manager stated that he believed that the individual had been "drinking and driving," and that when he asked his co-worker if she smelled alcohol, the co-worker said that she was not sure "but that it did smell like it."  The manager described the individual's vehicle, reported its license plate number, and told the 9-1-1 dispatcher that it was in the parking lot by the restaurant.[3]  The manager also noted that there was a passenger in Martin's vehicle.

[¶6]  When two dispatched officers arrived at the scene, Martin's vehicle was still in the parking lot behind the Burger King, accessible via a busy street in Brewer.  When one of the officers approached the vehicle, the vehicle started to pull away, at which point the other officer moved his cruiser in front of the vehicle to prevent the vehicle from leaving.  The approaching officer arrived at the driver's side of the vehicle and noticed that the bottom half of the steering column was missing.  He also saw an open can of Twisted Tea with a straw in it in the center console.

---

[3]  Martin notes that when dispatched, the officers were told that the report had indicated the reporter's belief that the individual was "drunk," instead of exactly quoting the manager's statement of belief that the individual had been "drinking and driving" and smelled of alcohol.  This difference is immaterial to the issues on appeal, as discussed *infra*.

4

[¶7]  When asked about the can, Martin and his passenger claimed that it was from the night prior.  The officer took the open can and later dumped out the remainder of its contents while smelling its odor, which he recognized as Twisted Tea.

[¶8]  When the officer asked for Martin's name, Martin falsely claimed to be "Mark Medor" and did not provide any identifying documents.  The passenger also provided a false name.  The inquiring officer returned to his cruiser and attempted to verify the identifying information that Martin and the passenger had provided but did not find anyone who matched that information. The officers also determined that the vehicle's registration had expired.

[¶9]  The other officer asked Martin for accurate identifying information, and Martin continued to give a false name.  Eventually, that officer asked Martin to exit his vehicle.  Even after the officer issued a verbal warning of the consequences for not providing his correct name, address, and date of birth, Martin continued to provide false information.[4]

---

[4] *See* 29-A M.R.S. § 105 (2025):

> **1.  Authority to stop motor vehicle.**  If a law enforcement officer has reasonable and articulable suspicion to believe that a violation of law has taken or is taking place, that officer, if the officer is in uniform, may stop a motor vehicle for the purpose of:
>
> **A.** Arresting the operator for a criminal violation;

**B.** Issuing the appropriate written process for a criminal or civil violation or a traffic infraction; or

**C.** Questioning the operator or occupants.

**2. Scope of inspection.** A law enforcement officer who has stopped a motor vehicle pursuant to subsection 1 may demand and inspect the driver's license, certificate of registration, permits and the identification numbers of the motor vehicle. . . .

. . . .

**4. Violation.** A person is guilty of a Class E crime if a law enforcement officer has probable cause to believe the person violated or is violating this Title and the person intentionally fails or refuses upon request to give the person's correct name, address or date of birth to a law enforcement officer.

*See also* 17-A M.R.S. § 15-A(2):

Any person who a law enforcement officer has probable cause to believe has committed or is committing a crime other than one listed under section 15, subsection 1, paragraph A, and to whom a law enforcement officer is authorized to deliver a summons pursuant to subsection 1, who intentionally fails or refuses to provide to that officer reasonably credible evidence of that person's correct name, address or date of birth commits a Class E crime, if the person persists in the failure or refusal after having been informed by the officer of the provisions of this subsection. If that person furnishes the officer evidence of the person's correct name, address and date of birth and the evidence does not appear to be reasonably credible, the officer shall attempt to verify the evidence as quickly as is reasonably possible. During the period the verification is being attempted, the officer may require the person to remain in the officer's presence for a period not to exceed 2 hours. During this period, if the officer reasonably believes that the officer's safety or the safety of others present requires, the officer may search for any dangerous weapon by an external patting of that person's outer clothing. If in the course of the search the officer feels an object that the officer reasonably believes to be a dangerous weapon, the officer may take such action as is necessary to examine the object, but may take permanent possession of the object only if it is subject to forfeiture. The requirement that the person remain in the presence of the officer does not constitute an arrest. After informing that person of the provisions of this subsection, the officer may arrest the person either if the person intentionally refuses to furnish any evidence of that person's correct name, address or date of birth or if, after attempting to verify the evidence as provided for in this subsection, the officer has probable cause to believe that the person has intentionally failed to provide reasonably credible evidence of the person's correct name, address or date of birth.

[¶10]   After being informed that he was under arrest, Martin finally admitted that he was providing a false name and provided his actual identity. He also indicated that he had an outstanding arrest warrant.  After running Martin's actual information, the officers discovered that he had six active arrest warrants and twelve sets of active bail conditions.

[¶11]   One of the officers then conducted a search of Martin's person. Martin informed the officers that his identification was in his wallet.  When one of the officers reached into Martin's pocket for that ID, the officer discovered a methamphetamine pipe next to the wallet.  The officers then found thirty-four grams of methamphetamine in Martin's front pocket and approximately five grams of fentanyl in another pocket.

[¶12]   The officers then searched Martin's vehicle, including a toolbox located in the open bed of his truck.  One of the officers opened the toolbox with a screwdriver and opened a Pelican case found therein.  Inside the Pelican case, the officer found a large quantity of drugs and drug paraphernalia.  Neither officer provided *Miranda* warnings to Martin during the encounter.

**B.     The Orders on the Motion to Suppress**

**1.     The Initial Order on the Motion to Suppress**

[¶13]  On October 2, 2024, the court granted Martin's motion to suppress. The court concluded that the stop was not based on reasonable articulable suspicion because the vehicle had been located in a parking lot, which was "not a public way as defined by the statute."

**2.     The State's Motion for Further Findings and to Reconsider**

[¶14]  On October 22, 2024, the State filed a motion for further findings of fact and conclusions of law and for reconsideration of the suppression order.[5] The State noted, inter alia, that investigatory stops requiring reasonable articulable suspicion can be based solely on safety; that the facts included that the manager had observed an open alcoholic container in the vehicle next to the

---

[5]  As to further findings of fact and conclusions of law, the State requested that the court issue findings addressing

> (1) whether the Burger King manager told dispatch of his concern about drinking and driving, that a Burger King employee smelled alcohol on Martin, and whether this information, if found, would be sufficient to constitute a safety concern;
>
> (2) whether dispatch informed the officers that the Burger King employee thought Martin was intoxicated and, if so, whether this would impact the "objective reasonableness of the officer's actions in stopping Martin";
>
> (3) whether entering the Burger King parking lot required Martin to exit a public way or whether he would have had to enter a public way to leave the lot and whether this "establishes a reasonable suspicion that either a criminal or civil violation has, was, or was about to occur"; and
>
> (4) "[w]hy the Court's order would serve the purposes of the exclusionary rule."

8

driver, an employee thought she had smelled alcohol on Martin, and the manager had voiced concerns about drinking and driving; and that the court had not considered whether a civil violation regarding open containers had occurred or was about to occur.[6]

[¶15]   With respect to the violation's requirement that the alcohol consumption or possession occur on a "public way," the motion argued that "it was objectively reasonable to believe that as soon as the vehicle began moving, Martin had nowhere to travel except back onto a public way.  Likewise, it was reasonable for the officers to infer and suspect a civil violation had already occurred, as the open container arrived in the parking lot of an establishment that did not sell alcohol.  Either would justify an investigatory detention."

### 3.    The Court's Order on the State's Motion for Additional Findings and Amended Order on the Motion to Suppress

[¶16]   On February 20, 2025, the court ruled on the State's motions. Regarding the addition of findings, the court added, inter alia, "The Burger King parking lot in Brewer is only accessible via a public way."   The court

---

[6] *See* 29-A M.R.S. § 2112-A (2025):

**2. Violation.**  The operator of a vehicle on a public way is in violation of this section if the operator or a passenger in the passenger area of the vehicle:

**A.** Consumes alcohol; or

**B.** Possesses an open alcoholic beverage container.

reconsidered and denied the motion to suppress, stating that "[u]pon reexamination of the evidence" submitted at the June 2024 evidentiary hearing, the court found that Martin "began moving his vehicle in the parking lot upon the officer's approach. [Martin's] travel would have ultimately brought him onto a public way." The court concluded:

> [Martin's] movement, in conjunction with the information from the dispatcher gave the [officers] a reasonable belief that [he] was about to commit the offense of operating a vehicle on a public way with an open container of an alcoholic beverage. The officers' stop of [Martin's] vehicle was lawful on that basis. [Martin's] failure to provide the officers with a verifiable identification justified his continued detention. His ultimate arrest for failure to give a correct name was appropriate based on the conflicting identification statements made by the defendant. [The officer] lawfully searched [Martin] pursuant to that arrest, locating methamphetamine on his person. The presence of the methamphetamine gave the [officers] probable cause to search his vehicle and any containers in or on the vehicle capable of holding illegal drugs.

[¶17] Martin filed a motion for findings of fact and conclusions of law on February 26, 2025, which was denied on February 28. On March 4, 2025, Martin filed a motion asking the court to address other arguments he had made to support his motion to suppress concerning, inter alia, alleged *Miranda* violations and the seizure of $2,862 from Martin's wallet. A non-evidentiary hearing on that motion was held on March 11, 2025.

[¶18]   On March 20, 2025, the court rejected Martin's remaining arguments.   The court found that that the State only presented Martin's statements of identification and concluded that those statements did not require *Miranda* warnings.  The court further found that the discovery of the drugs on Martin gave the officers "probable cause to believe that he was engaged in drug trafficking and that the currency found on his person were the proceeds of that activity," rendering the seizure of the $2,862 lawful.

## C.     Plea and Sentencing

### 1.     The Plea Hearing

[¶19]  In April 2025, Martin entered a conditional guilty plea to all the charges except for forfeiture.  *See* M.R.U. Crim. P. 11(a)(2).  The plea agreement provided that the forfeiture charge would be addressed as part of the contested sentencing.

[¶20]  During the hearing on his plea, Martin conceded that the evidence reflected that during the officers' search of Martin's person, they discovered 34 grams of methamphetamine and 4 grams of fentanyl on his person along with $2,862 in cash in his wallet and that the officers had found 334 grams of methamphetamine, 116 grams of fentanyl, 20 grams of cocaine, 22 Oxycodone pills, hundreds of plastic bags, a scale, Narcan, lighters, and another $227 in

cash inside the Pelican box in Martin's trunk.

## 2. Sentencing

[¶21]  The court held a sentencing hearing on May 13, 2025.  At that hearing, per the parties' agreement, the court also addressed Count 7, seeking forfeiture of the cash.

[¶22]  The court ordered forfeiture of the $3,100 found on Martin and in his vehicle, finding that, given the nature of Martin's crimes and the location where the seized money was found, the money constituted either drug proceeds or funds that would be used to facilitate drug trafficking.

[¶23]  At the close of the hearing, Martin was sentenced to fourteen years' imprisonment, with all but seven years suspended and three years of probation and was assessed a $400 fine.  He filed a timely notice of appeal on May 19, 2025.  *See* M.R. App. 2B(b)(1).

## II.  DISCUSSION

[¶24]  Martin asserts three arguments: (A) the revisitation of the initial order granting the motion to suppress was improper; (B) the motion to suppress should have been granted; and (C) the $2,862 found in Martin's wallet should not have been forfeited.  We address the arguments seriatim.

12

**A.    The court did not err or abuse its discretion in revisiting its initial suppression order.**

[¶25]  Martin launches a salvo of assertions as to why the State could not seek reconsideration and why the court lacked authority to revisit its initial order.  None has merit.

[¶26]  Nothing in the Rules of Unified Criminal Procedure expressly provides for motions for further findings of facts or motions to reconsider orders regarding motions to suppress.  Rule 1(c) provides that "[w]hen no procedure is specifically prescribed, the court shall proceed in any lawful manner not inconsistent with the Constitution of the United States or of the State of Maine, the Maine Rules of Criminal Procedure, these Rules, or any applicable statutes."  M.R.U. Crim. P. 1(c).  Hence, we ask whether any other rule is inconsistent with a trial court's ability to revisit an order on a motion to suppress, either through requested additional factfinding or reconsideration of the application of the law to the facts.

[¶27]  Both Martin and the State allude to Rule 41A(d), which provides that when a motion to suppress "is granted or denied, the court shall make findings of fact and conclusions of law either on the record or in writing.  If the court fails to make such findings and conclusions, a party may file a motion seeking compliance with the requirement."  M.R.U. Crim. P. 41A(d).  Martin cites

this rule to argue that if the court initially includes some findings and conclusions in its order, the rule should be read to prohibit a motion requesting further findings. The State argues that the language of the rule permits the State to file a motion when it deems the facts that were found inadequate for appellate review. We believe that the relevant point is that nothing in Rule 41A(d) is *inconsistent* with a motion seeking further findings or reconsideration.

[¶28] Referencing Rule 41A, we have in the past recognized that either a defendant or the State may move for further findings of fact and conclusions of law and reconsideration of a suppression order. *See State v. Fitzgerald*, 2025 ME 65, ¶ 10, 340 A.3d 121 (on the State's motion for further findings and to reconsider); *State v. King*, 2009 ME 14, ¶ 4, 965 A.2d 52 (same); *State v. Cunneen*, 2019 ME 44, ¶ 16 n.4, 205 A.3d 885 (on the defendant's motion).[7]

---

[7] We note that in *Fitzgerald*, we stated that because the State had moved for further findings, we would not assume that the trial court found facts beyond those that it stated. 2025 ME 65, ¶ 3, 340 A.3d 121. Here, both the State and Martin filed motions for further findings. In *Cunneen*, we explained, at length, that in the civil context, a motion for additional findings of fact that does not actually present proposed affirmative findings and conclusions that the movant seeks the court to issue would be "fatally defective." 2019 ME 44, ¶ 16 n.4, 205 A.3d 885 (noting that "[n]either criminal rule 41A(d) nor our case law extends that requirement to motions for findings and conclusions filed in criminal cases," but stating that "[n]onetheless, to effectively focus the court on the evidence and issues that the movant wishes the court to address, a prudent party in a criminal case who files a motion pursuant to Rule 41A(d) will adhere to the requirements associated with the civil rules"). Neither the State nor Martin adhered to those requirements.

Here, as to the first three findings it proposed, the State articulated the affirmative findings it sought, straying from our directive only in posing the additions as questions ("whether"). Its fourth

14

[¶29]  In *State v. Sasso* we stated that, under Rule 41A(d), "[i]f no facts are found or the factual findings are not sufficient to disclose the basis for the court's decision, the party responsible for an adequate record, the appellant, has the burden to request the court to make findings if none are made, or to expand on inadequate findings in order for the record to be meaningful for appellate review."  2016 ME 95, ¶ 18, 143 A.3d 124 (quotation marks omitted); *cf. State v. Ouellette*, 2024 ME 29, ¶ 11, 314 A.3d 253.  Hence, if the State concludes that the findings of fact in a suppression order are inadequate for appellate review, it not only can but should file a motion for additional findings of fact.

[¶30]  More broadly, in the absence of prejudice or a specific time constraint in the rules, either the State or a defendant may file a motion to reconsider a pretrial court ruling.  *See State v. Hayford*, 412 A.2d 987, 990 (Me. 1980) ("The Superior Court had continuing jurisdiction of the defendant's

---

and last proposed finding is not a finding at all.  Martin's motion did not resemble a request to add identified facts to the record relating to the merits but simply recited procedural arguments.

*In the future*, in the absence of motions that properly propose affirmative findings and conclusions sought, we will not constrain our review to the specific factfinding and conclusions of the suppression court.

In any event, here, the State's motion for further findings of fact was incorporated into a motion to reconsider.  *See supra* ¶ 14-15.  In addressing the State's motion to reconsider, the court was free to consider any record evidence in weighing the merits of the State's legal arguments and to include additional findings of fact in its order on the motion.

case. The original order granting the motion to suppress was not a final judgment. . . . [T]he interests of judicial economy are well served where, as here, the presiding Justice determined that his original order was erroneous.").[8]

[¶31] As noted in *Hayford*, we review the court's decision as to whether to revisit for abuse of discretion. *Id.* No such abuse occurred here. The additional finding requested by the State regarding the ingress and egress to the lot was supported in the June 21, 2024 hearing record but not included in the court's October 2 order. As discussed further *infra*, that finding was relevant to whether the officers had reasonable articulable suspicion that a violation had occurred or was about to occur. The State's legal arguments contained in its motion to reconsider were worthy of the court's consideration as to whether the court had erred in its legal reasoning or had failed to weigh a fact relevant to its ruling.

[¶32] In sum, the State's motion was proper, as was the trial court's decision to grant the motion and revisit its initial ruling.[9]

---

[8] That said, motions to reconsider should not be routine. *See State v. DiPietro*, 2009 ME 12, ¶ 15, 964 A.2d 636 ("[B]ecause DiPietro's motion for reconsideration [regarding a motion to suppress] did not allege an error, omission, or new material that could not previously have been presented, the court did not abuse its discretion in denying DiPietro's motion to reconsider and for findings of fact and conclusions of law.").

[9] Martin argues that he was entitled to a hearing on the State's motion. He was not entitled to such a hearing because he did not request one and in his opposition to the State's motion before the trial court, he indicated that "[n]othing more needs to be stated on the subject." Even if he had made

**B.     The court did not err in denying the motion to suppress.**[10]

[¶33]    We identify as sufficiently developed for review Martin's arguments that (1) the officers lacked reasonable articulable suspicion to engage in an investigatory stop because Martin's vehicle had not been located on a public way; and (2) the police lacked probable cause to open the locked box without a warrant.

[¶34]  We "review the court's factual findings for clear error and its legal conclusions de novo and will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the court's decision."  *Cunneen*, 2019 ME 44, ¶ 13, 205 A.3d 885 (quotation marks omitted).  We view the facts in the light most favorable to the court's ultimate order on the motion to suppress.  *See State v. Prescott*, 2012 ME 96, ¶ 2, 48 A.3d 218.

---

such a request, we have held that a court is not required to hold a hearing on a motion for reconsideration.  *Hayford*, 412 A.2d at 990 n.7.

To the extent that Martin asserts any other arguments as to why the court lacked authority to revisit its suppression order, we regard them as either undeveloped or without merit.

[10]  Martin preserved and developed his arguments concerning the court's denial of his motion to suppress under only the United States Constitution, not article 1, section 5 of the Maine Constitution. Therefore, the only issue before us is whether the motion to suppress should have been granted under the Fourth Amendment.  *See State v. Norris*, 2023 ME 60, ¶ 33, 302 A.3d 1.

**1.     The court did not err in ruling that the officers had reasonable articulable suspicion for the investigatory stop.**

[¶35]   "In order to support a brief investigatory stop of a motor vehicle, . . . a police officer must have an objectively reasonable, articulable suspicion that either criminal conduct, a civil violation, or a threat to public safety has occurred, is occurring, or is about to occur." *State v. Sylvain*, 2003 ME 5, ¶ 11, 814 A.2d 984.   Reasonable articulable suspicion is a substantially less burdensome standard than preponderance of the evidence.   *State v. Burgess*, 2001 ME 117, ¶ 8, 776 A.2d 1223.   A reasonable articulable suspicion "need only be more than speculation or an unsubstantiated hunch."   *State v. Porter*, 2008 ME 175, ¶ 9, 960 A.2d 321.

[¶36]   There were multiple grounds for such suspicion.   First, as noted *supra* in footnote 5, Maine's open container statute provides that the operator of a vehicle "on a public way" violates the statute if the operator or a passenger "[c]onsumes alcohol" or "[p]ossesses an open alcoholic beverage container." 29-A M.R.S. § 2112-A(2) (2025).   A public way, under the statute, is "a way, including a right-of-way, owned and maintained by the State, a county or a municipality over which the general public has a right to pass."   *Id.* § 2112-A(1)(D).   If the only way in and out of a private lot is directly onto a public street—and Martin does not contest this finding (supported by the

bodycam video)—and the police are told (correctly, as it turned out), that there is an open container of alcohol by the driver's seat, once the vehicle starts moving, presumably to exit, the facts are sufficient to establish the necessary suspicion that Martin had driven or was about to drive on a public way with an open container of alcohol.[11]

[¶37] Similarly, the report of the manager's belief that Martin had been "drinking and driving," and that his co-worker had smelled alcohol on Martin supported the suspicion that Martin or his passenger had been or would be consuming alcohol on the public way, also violating the statute.[12]

---

[11] That Martin was not found when he was on the public way it not dispositive. As a federal district court reasoned under similar circumstances:

> [T]he stop was nonetheless valid because Officer Berling clearly had a reasonable, articulable suspicion that defendant had driven his car on a "highway of this Commonwealth" just minutes before entering the Chantilly Public Library parking lot and that he would have to do so again to depart the parking lot. To ignore this circumstance as justifying the traffic stop in this case would lead to the anomalous result that an officer who observed a vehicle operating in an unsafe manner or condition in a public parking lot could not stop the vehicle until it entered the road. In other words, the purposes of an investigatory stop would be frustrated because officers would be prohibited from making such a stop to prevent potential dangers from materializing.

*United States v. Stewart*, 149 F. Supp. 2d 236, 242-43 (E.D. Va. 2001) (footnotes omitted), *aff'd*, 42 F. App'x 643 (4th Cir. 2002); *see also State v. George*, No. 126,414, 2025 WL 670291 at *5 (Kan. Ct. App. Feb. 28, 2025) ("George also argues that K.S.A. 8-1599, the statute regulating open alcohol containers in moving vehicles, only prohibits such conduct on public roads. He argues that he could legally drive his truck in a parking lot with an open container of alcohol. But the undisputed evidence of George shifting his vehicle into gear created a reasonable and common-sense inference that he intended to drive out of the parking lot and onto a public street.").

[12] This report of potential alcohol consumption and Martin's driving away as the officer approached was also at least arguably sufficient to stop the vehicle to investigate whether Martin

[¶38]  Armed with reasonable articulable suspicion to stop the vehicle, the officers could legally question Martin and the passenger and ask for identification.  *See* 29-A M.R.S. § 105 (2025); *State v. Gulick*, 2000 ME 170, ¶ 15, 759 A.2d 1085; *State v. Hill*, 606 A.2d 793, 795 (Me. 1992); *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (noting that among the checks that may be conducted during a lawful traffic stop are "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"); *Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 187 (2004) ("The principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry* stop.").  Indeed, asking for such information even after arrest is not a *Miranda* violation.  *See State v. Griffin*, 2003 ME 13, ¶ 9, 814 A.2d 1003 ("Even in a custodial situation, an officer may ask questions designed to identify the suspect, check her identification and resolve any health or safety concerns regarding the suspect

---

was driving while under the influence of intoxicants or while having an alcohol level of .08 more of alcohol per 100 milliliters of blood or 210 liters of breath under 29-A M.R.S. § 2411(1-A) (2025). *See State v. Morris*, 259 P.3d 116, 125 (Utah 2011) (odor of alcohol sufficient to generate reasonable suspicion of criminal activity); *Motor Vehicle Admin. v. Spies*, 82 A.3d 179, 187 (Md. 2013) (holding that moderate odor of alcohol emanating from the person of motorist, alone, provided an adequate basis for a law enforcement officer to suspect that the motorist was driving while under the influence of, or impaired by, alcohol); *Cantrell v. State*, 280 S.W.3d 408, 412-13 (Tex. App. 2008) (report of drive-in witness of "her concerns regarding [the defendant] consuming alcohol and driving" coupled with driver's slowing of the car and failure to make eye contact with the officer sufficient to create reasonable articulable suspicion).

or others."); *United States v. Reyes*, 225 F.3d 71, 77 (1st Cir. 2000) ("[I]t would be a rare case indeed in which asking an individual his name, date of birth, and Social Security number would violate *Miranda.*").

[¶39]  Thus, the officers had the necessary reasonable articulable suspicion to stop the vehicle and ask for identification.

**2.   The court did not err in ruling that the officers had probable cause to search Martin's person and then the entirety of the vehicle and the containers found in it.**

[¶40]  As we stated in *State v. Lepenn*, 2023 ME 22, ¶ 17, 295 A.3d 139:

> Probable cause exists where facts and circumstances within the knowledge of the officers and of which they have reasonably trustworthy information would warrant a prudent and cautious person to believe that the arrestee did commit or is committing the felonious offense.  The probable cause standard is flexible and based on common sense.  Although requiring more than mere suspicion, probable cause can be satisfied on less than the quantum of proof necessary to establish a fact by a fair preponderance of the evidence.  Probable cause has a very low threshold and uses an objective standard.  The determination of whether an officer has probable cause is not based on whether the particular officer believed that she had probable cause.

(Citations and quotation marks omitted.)

[¶41]  After Martin gave the officers false identifying information, they had probable cause to arrest him.  *See* 29-A M.R.S. § 105(4) ("A person is guilty of a Class E crime if a law enforcement officer has probable cause to believe the person violated or is violating this Title [which includes the open container law]

and the person intentionally fails or refuses upon request to give the person's correct name, address or date of birth to a law enforcement officer"); *see also* 17-A M.R.S. § 15-A(2) ("Any person who a law enforcement officer has probable cause to believe has committed or is committing a crime [here the Class E crime based on section 105(4)] . . . who intentionally fails or refuses to provide to that officer reasonably credible evidence of that person's correct name, address or date of birth commits a Class E crime, if the person persists in failure or refusal after having been informed by the officer of the provisions of [the statute].").

[¶42]  Once Martin was lawfully placed under arrest, the officers were permitted to conduct a full search of his person incident to that arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973); *State v. Foy*, 662 A.2d 238, 241 (Me. 1995).  That search of Martin's person revealed thirty-four grams of methamphetamine in Martin's front pocket and approximately five grams of fentanyl in another pocket.

[¶43]  The discovery of the drugs on Martin's person, together with the quantity of the drugs and significant amount of cash found on Martin's person, his proffer of a false identity, his passenger's similar proffer of a false identity, and his outstanding arrest warrants provided the officers with probable cause that evidence of a crime would be found in the vehicle.  *See Carroll v. United*

*States*, 267 U.S. 132, 155-56 (1925) (a warrantless search for contraband concealed and illegally transported in a vehicle may be searched for without a warrant based upon probable cause); *State v. Tomah*, 586 A.2d 1267, 1269 (Me. 1991) ("Today, the inherent mobility of a motor vehicle coupled with the reduced expectation of privacy associated with it justifies the warrantless search of that vehicle so long as the search is supported by probable cause.").[13]

[¶44]  "[A] trunk is not exempt from a search . . ."  *State v. Ireland*, 1998 ME 35, ¶ 8, 706 A.2d 597.  "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."  *United States v. Ross*, 456 U.S. 798, 825 (1982); *see also State v. Lux*, 1999 ME 136, ¶ 14, 740 A.2d 556 ("Because those legitimate objects of the search could have been concealed in the safe in the trunk of Lux's car, the search of the safe was supported by probable cause.").  Thus, once the police found drugs on Martin's person, that gave the officers probable cause to search every part of the vehicle that could

---

[13]  This is not to say that any quantity of illegal drugs found on a driver's person, however minuscule, would alone always justify a search of the driver's vehicle.  *But see Meister v. State*, 933 N.E.2d 875, 879-80 (Ind. 2010) (powdery residue inside a pen without inner parts alone provided probable cause to search the vehicle).  The totality of the circumstances here, however, is sufficient. *See United States v. Harvey*, 16 F.3d 109, 112 (6th Cir. 1994) ("We hold that the cocaine found on the person of the driver, the false information given to the officers regarding the car's ownership, and the fact that none of the individuals in the car had a valid driver's license, provided probable cause for the officers to believe that the car contained other drugs or paraphernalia, and that the search of the entire automobile was proper.").

contain evidence of illegal drug activity, which included the containers in which the police found drugs and cash.

[¶45] In sum, at each stage of the encounter, the police officers had the requisite level of suspicion to conduct their searches, and the trial court did not err in denying the motion to suppress.

## C. There was sufficient evidence to support the court's forfeiture order, which did not violate Martin's Eighth Amendment rights.

[¶46] Martin asserts two arguments challenging the seizure and forfeiture of $2,864 from his wallet: (1) there was insufficient proof that the money was drug-related; and (2) the forfeiture violated the Excessive Fines Clause of the Eighth Amendment.

### 1. The court reasonably found that the State met its burden under section 5826.

[¶47] "Forfeiture of the property must be proved by the State by a preponderance of the evidence." 15 M.R.S. § 5826(4)(A). When reviewing a challenge to the sufficiency of the evidence under section 5826, "we view the evidence in the light most favorable to the State to determine whether there is competent evidence in the record to support a finding that the property is subject to forfeiture." *State v. Pierce*, 2006 ME 75, ¶ 21, 899 A.2d 801. Subject to forfeiture are "all money, negotiable instruments, securities or other things

24

of value furnished or intended to be furnished by any person in exchange for a scheduled drug in violation of Title 17-A, chapter 45; all proceeds traceable to such an exchange; and all money, negotiable instruments and securities used or intended to be used to facilitate any violation of Title 17-A, chapter 45." 15 M.R.S. § 5821(6) (2025).[14]

[¶48]  The trial court stated the basis for its forfeiture decision: "given the nature of [Martin's] crime" and "where [the] money was found," it was "satisfied that [the money] was either drug proceeds or funds intended to be used to facilitate drug trafficking."  We conclude that the court, as a reasonable factfinder, could so find by a preponderance of the evidence.

[¶49]  Martin was carrying the cash on his person and in his vehicle, with large quantities of drugs also found on his person and in the vehicle.  Prior to the court's issuance of the forfeiture order, Martin had pled guilty to drug possession and trafficking charges.  At the hearing, Martin's father, who had allegedly bought a truck from Martin in exchange for the money found in Martin's wallet, testified that he did not know what Martin would do with that money.  Even if it had credited the father's testimony that the money constituted proceeds from the sale of his truck, the court could reasonably

---

[14]  The statute contains exceptions that are not applicable or argued to be applicable here. *See* 15 M.R.S. §§ 5821(6)(A), 5821-A, 5821-B (2025).

determine that the money would more likely than not be used for future drug transactions. *See State v. Fox*, 2017 ME 52, ¶ 37, 157 A.3d 778 (holding that evidence including the defendant's refusal to identify himself, the quantity of drugs discovered, the amount of cash discovered, and the proximity of the drugs and cash to the defendant constituted competent evidence to support a finding that cash was subject to forfeiture).

### 2. The forfeiture did not violate the Eighth Amendment.[15]

[¶50]  The Eighth Amendment precludes criminal forfeitures that are grossly disproportional to the gravity of the defendant's offense. *See Austin v. United States*, 509 U.S. 602, 610 (1993) (Eighth Amendment applies to forfeitures whether criminal or civil); *United States v. Bajakajian*, 524 U.S. 321, 337 (1998) (the test applied is whether the forfeiture is grossly disproportional to the gravity of the defendant's offense); *State v. Goncalves*, 2025 ME 70, ¶ 34, 340 A.3d 639 ("The Eighth Amendment does not mention disproportionate punishments explicitly, but rather incorporates the principle that a grossly

---

[15] Martin did not raise this argument before the trial court and the State argues that it is waived. We need not address whether the argument is waived or should be reviewed only for obvious error or under some lesser standard of review (Martin did not respond to the State's argument or otherwise discuss the applicable standard of review in his briefs) because whatever the applicable standard of review, as discussed *infra*, the forfeiture did not violate the Excessive Fines Clause of the Eighth Amendment.

disproportionate punishment is cruel and unusual." (Quotation marks omitted)).

[¶51] In *State v. Lubee*, 93 Me. 418, 421, 45 A. 520, 521 (1899), applying article 1, section 9 of the Maine Constitution, our counterpart to the Excessive Fines Clause in the Eighth Amendment, we stated, "In determining the question whether the punishment imposed by a statute is proportional to the offense, or whether or not a fine imposed is excessive, regard must be had to the purpose of the enactment, and to the importance and magnitude of the public interest sought by it to be protected." The First Circuit has adopted a similar test under the federal clause. *See United States v. Heldeman*, 402 F.3d 220, 223 (1st Cir. 2005) (identifying as the pertinent factors "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature . . . ; and (3) the harm caused by the defendant").[16] The forfeiture should also not deprive the defendant of his livelihood. *United States v. Levesque*, 546 F.3d 78, 83 (1st Cir. 2008).

---

[16] The First Circuit has stated that three tests "have surfaced" for making the disproportionality determination under the Excessive Fines Clause: (1) the "instrumentality" or "nexus" test, (2) the "proportionality" test, and (3) the "hybrid instrumentality-proportionality" test. *United States v. 45 Claremont St.*, 395 F.3d 1, 5 (1st Cir. 2004). "The 'instrumentality' test focuses on the connection between the alleged wrong and the property subject to forfeiture"; the "proportionality" test "compares 'the harshness of the forfeiture with the severity of the crime'"; and the "hybrid" test, adopted by the First Circuit, "combines the two." *Id. See generally also* Eric C. Surette, Annotation, *When Does Forfeiture of Currency, Bank Account, or Cash Equivalent Violate Excessive Fines Clause of Eighth Amendment*, 164 A.L.R. Fed. 591 (2000).

[¶52]   As a threshold matter, there is an argument that the Eighth Amendment does not apply to the proceeds of criminal activity.  *See United States v. Twenty One Thousand Two Hundred Eighty Two Dollars*, 47 F.3d 972, 973 (8th Cir. 1995) ("The forfeiture of proceeds of criminal activity which simply parts the owner from the fruits of the criminal activity does not constitute punishment and thus does not implicate the Eighth Amendment.") (quotation marks omitted); *United States v. Jalaram, Inc.*, 599 F.3d 347, 357-59 (4th Cir. 2010) (King, J., concurring); s*ee also* Eric C. Surette, Annotation, *When Does Forfeiture of Currency, Bank Account, or Cash Equivalent Violate Excessive Fines Clause of Eighth Amendment*, 164 A.L.R. Fed. 591, § 9[a] (2000); *but see United States v. Lyons*, 870 F. Supp. 2d 281, 292 & n.5 (D. Mass. 2012) (noting the disagreement among the U.S. Courts of Appeals and identifying the First Circuit as falling within the camp concluding that proceeds are included in review under the Eighth Amendment).[17]

[¶53]   In any event, assuming the applicability of the Excessive Fines Clause to the totality of the cash forfeited here,[18] Martin falls into the class of

---

[17]  Under the tally taken in *Lyons*, the Fifth, Seventh, Eighth, and Tenth Circuits fall into the camp that conclude that proceeds are excluded, while the First, Fourth, Sixth, and Eleventh Circuits fall into the opposite camp.  *See Lyons*, 870 F. Supp. at 292 n.5.

[18]  The State agreed in this appeal that "criminal forfeitures are circumscribed by the Eighth Amendment."

persons at whom the statutes regarding drug trafficking and forfeiture were directed, and the large amount of drugs found reflect the harm that he has caused.  The forfeiture statute is broadly written to embrace all money or other things of value "furnished or intended to be furnished in exchange for a scheduled drug, or . . . traceable to such an exchange.  The plain language does not limit the subject of forfeiture to money that is traceable to the particular drug transaction that led to the conviction . . . ."  *Pierce*, 2006 ME 75, ¶ 23, 899 A.2d 801.  Martin has not argued that his livelihood is adversely affected by the forfeiture.[19]  The constitutional requirements were met.

### III.  CONCLUSION

[¶54]  Martin was found in possession of a significant quantity of drugs.  The question is whether the officers who discovered those drugs acted under the requisite level of suspicion at each stage of their interaction with Martin.  We hold that the trial court did not err in determining that they did.  Further, we hold that the trial court's consideration of, and rulings on the State's motions were proper.  Finally, we affirm the forfeiture order as it was supported by sufficient evidence and did not impose an excessive fine.

---

[19]  Indeed, Martin's only argument, cursorily made, is a conclusory assertion that the forfeiture was disproportional, and he apparently bases his argument solely on his unsuccessful contention that the money in the wallet was not drug related.

The entry is:

Judgment affirmed.

---

N. Laurence Willey Jr., Esq. (orally), and Ezra A.R. Willey, Esq., Willey Law Offices, Bangor, for appellant Joshua Martin

Aaron M. Frey, Attorney General, and Jason Horn, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2022-3694
FOR CLERK REFERENCE ONLY